## UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH DAKOTA
### WESTERN DIVISION

GERALD J. ROGERS and )
CHERYL A. ROGERS, )
)
    Plaintiffs, )    CIVIL NO.: _5:21-cv-5046_____
)
    v. )
)
AURORA PUMP COMPANY, )    **<u>COMPLAINT</u>**
)    **<u>AND JURY DEMAND</u>**
CRANE CO., )
)
FLOWSERVE US INC., individually )
and as successor-in-interest to Edward )
Valves, Inc., )
)
FOSTER WHEELER )
CORPORATION, )
)
GENERAL ELECTRIC COMPANY, )
)
THE GOODYEAR TIRE & RUBBER )
COMPANY, )
)
GOULDS PUMPS, LLC, )
)
GRINNELL LLC, )
)
ITT LLC, individually and as )
successor-in-interest to BELL & )
GOSSETT DOMESTIC PUMP, )
)
POWELL VALVES, f/k/a THE )
WILLIAM POWELL COMPANY, )
)
SPX COOLING TECHNOLOGIES, )
INC., f/k/a Marley Cooling )
Technologies, Inc., f/k/a The Marley )
Cooling Tower Company, and )
)
WARREN PUMPS, LLC, )
)
    Defendants. )
)

## CIVIL ACTION COMPLAINT

PLAINTIFFS, Gerald J. Rogers, and Cheryl A. Rogers, his wife ("Plaintiffs"), by and through their undersigned counsel, hereby bring this Civil Action Complaint for damages, whereof the following is a statement:

## PARTIES

1.      Gerald J. Rogers and Cheryl A. Rogers are citizens and residents of Meade County, in the State of South Dakota.

2.      Defendant Aurora Pump Company, is a corporation incorporated under the laws of the State of North Carolina, having its principal place of business in Charlotte, North Carolina. Service of process may be effectuated by service upon: Aurora Pump Company, c/o Brenda Godfrey, SPX Corporation, 6325 Ardrey Kell Road, Suite 400, Charlotte, North Carolina, 28277.

3.      Defendant Crane Co. is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Stamford, Connecticut, and was formerly qualified to do business in the State of South Dakota. Service of process may be effectuated by service upon: Crane Co., c/o Crane Company, 100 First Stamford Place, Stamford, Connecticut 06902.

4.      Defendant Flowserve US Inc., individually and as successor-in-interest to Edward Valves, Inc., is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Irving, Texas. Service of process may be effectuated by service upon: Flowserve US Inc., individually and as successor-in-interest to Edward Valves, Inc., c/o CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, Texas 75201.

5.     Defendant Foster Wheeler Corporation is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Clinton, New Jersey, and was formerly qualified to do business in South Dakota. Service of process may be effectuated by service upon: Foster Wheeler Corporation, c/o United Agent Group, Inc., 3411 Silverside Road, Suite 104, Wilmington, Delaware 19810.

6.     Defendant General Electric Company is a corporation incorporated under the laws of the State of New York, having its principal place of business in Boston, Massachusetts, and is qualified to do business in the State of South Dakota. Service of process may be effectuated by service upon: General Electric Company, c/o CT Corporation System, 319 S. Coteau Street, Pierre, South Dakota 57501-3187.

7.     Defendant The Goodyear Tire & Rubber Company, is a corporation incorporated under the laws of the State of Ohio, having its principal place of business located in Akron, Ohio, and is qualified to do business in the State of South Dakota. Service of Process may be effectuated by service upon The Goodyear Tire & Rubber Company c/o Corporation Service Company, 503 S. Pierre Street, Pierre, South Dakota 57501-4522.

8.     Defendant Goulds Pumps LLC is a limited liability company organized under the laws of the State of Delaware. Its managers/members are John Capela, Craig E. Johnson, and Mary Beth Gustafsson.  John Capela is domiciled in the State of New Jersey, and Craig E. Johnson and Mary Beth Gustafsson are domiciled in the State of New York. Service of process may be effectuated by service upon: Goulds Pumps, LLC, c/o CT Corporation System, 28 Liberty St., New York, New York 10005.

9.     Defendant Grinnell LLC is a limited liability company organized under the laws of the State of Delaware, and was formerly qualified to do business in the State of South Dakota. Its managers/members are Anthony McGraw and Jennifer Leong. Anthony

McGraw is domiciled in the State of Colorado, and Jennifer Leong is domiciled in the State of North Carolina. Service of Process may be effectuated by service upon Grinnell LLC, c/o The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

10.     Defendant ITT LLC, individually and as successor-in-interest to Bell & Gossett Domestic Pump, is a limited liability company organized under the laws of the State of Indiana. Its managers/members are John Capela, Craig E. Johnson, and Mary Beth Gustafsson. John Capela is domiciled in the State of New Jersey, and Craig E. Johnson and Mary Beth Gustafsson are domiciled in the State of New York.  Service of Process may be effectuated by service upon ITT Corporation c/o CT Corporation System, 334 North Senate Avenue, Indianapolis, Indiana 46204.

11.     Defendant Powell Valves, f/k/a The William Powell Company, is a corporation incorporated under the laws of the State of Ohio, having its principal place of business in Cincinnati, Ohio. Service of Process may be effectuated by service upon Powell Valves c/o D.R. Cowart, 3261 Spring Grove Avenue, Cincinnati, Ohio 45225.

12.     Defendant SPX Cooling Technologies, Inc. f/k/a Marley Cooling Technologies, Inc. f/k/a The Marley Cooling Tower Company, is a corporation incorporated under the laws of the State of Delaware, having its principal place of business in Overland Park, Kansas, is qualified to do business in the State of South Dakota. Service of process may be effectuated by service upon SPX Cooling Technologies, Inc., c/o CT Corporation System, 319 S. Coteau St., Pierre, South Dakota 57501-3187.

13.     Defendant Warren Pumps, LLC, is a limited liability company organized under the laws of the State of Delaware. Its sole member is IMO Industries Inc., a corporation incorporated under the laws of the State of Delaware, having its principal place

of business in the State of Delaware. Service of process may be effectuated by service upon Warren Pumps, LLC, c/o Corporation Trust Company, 1209 Orange St., Wilmington, Delaware 19801.

## BACKGROUND

14.     Gerald J. Rogers was diagnosed with Malignant Mesothelioma, a signal tumor for exposure to asbestos, on or about February 16, 2021. Pathology Report attached as Exhibit "A".

15.     Mesothelioma is a rare cancer of the linings of the lungs, abdomen and heart.

16.     Mesothelioma is a signal tumor for exposure to asbestos.

17.     Mesothelioma is an indivisible injury.

18.     Asbestos is a complete carcinogen. Asbestos both initiates and promotes cellular damage that results in cancer.

19.     Asbestos exposures also can and do impair the body's ability to fight the formation of cancers and to fight cancers after they form.

20.     In a person who contracts mesothelioma as a result of exposure to asbestos dust, the cancer is caused by the accumulated effects of the person's lifetime of exposure to asbestos.  Any particular exposure may affect one or more of the following processes that contribute to the development of cancer: defeating the body's defense mechanisms to prevent or eliminate exposure to carcinogens, initiating genetic damage, stimulating cell division, promoting the formation of cancer, and impairing the body's defenses to the formation and spread of cancer.

21.     In an individual who develops mesothelioma as a result of asbestos exposures, it is impossible to retroactively attempt to ascertain in which step(s) in the

process of carcinogenesis any particular exposure was involved. Moreover, because asbestos fibers can persist in the body for significant portions of time and in different locations, exposures can have lasting biological impacts at more than one stage in the process of cancer development.

22.     Plaintiffs bring this action for monetary damages as a result of Mr. Rogers contracting the incurable asbestos cancer mesothelioma, caused by breathing asbestos dust.

23.     During the time period that Mr. Rogers was exposed to asbestos, the manufacturers of asbestos products affirmatively chose not to adequately warn of the lethal hazards of breathing asbestos dust, often deciding not to issue any warning at all, despite the fact that these asbestos companies knew that breathing small amounts of asbestos dust could be fatal. When asbestos dust is breathed in, it can cause asbestos cancer many decades later. The scientific and regulatory communities around the world are in unanimous agreement that all types of asbestos released from asbestos products cause cancer, and that there is no safe level of exposure to asbestos.

24.     Mr. Rogers' work placed him around asbestos-containing products, including but not necessarily limited to asbestos-containing gaskets, asbestos-containing packing, asbestos-containing boilers, asbestos-containing turbines, asbestos-containing valves, asbestos-containing pumps, asbestos-containing thermal insulation, asbestos-containing board, asbestos-containing cement, and asbestos-containing cooling towers, all of which can release vast amounts of asbestos dust into the air when disturbed. At present, it is known that Mr. Rogers' employment related to these allegations includes the following work site:

**1970-2009**:    Black Hills Power & Light – Kirk Plant – Lead, South Dakota

25.     Mr. Rogers' exposure to asbestos occurred when he worked as a Laborer, Coal Operator, Fireman's Helper, Fireman, and Turbine Generator Operator for Black Hills Power & Light at its Kirk Plant, from at least 1970 to 1979. Asbestos dust was generated and released into the air when Mr. Rogers, and other co-workers in close proximity, used, manipulated, and cleaned asbestos-containing products, including but not necessarily limited to: asbestos-containing gaskets, asbestos-containing packing, asbestos-containing boilers, asbestos-containing turbines, asbestos-containing valves, asbestos-containing pumps, asbestos-containing thermal insulation, asbestos-containing board, asbestos-containing cement, and asbestos-containing cooling towers, via changing, replacing, removing, repairing, manipulating, scraping, brushing, grinding, cleaning, and sweeping. The asbestos dust generated during the use, manipulation, and cleaning process is invisible to the naked eye. Investigation continues into Mr. Rogers' work with asbestos products and his exposures to those products.

## JURISDICTION AND VENUE

26.     This Court has personal jurisdiction over the Defendants because the Defendants are duly licensed to do business in the State of South Dakota and/or at all material times are or have been engaged in business in the State of South Dakota.

27.     Each Defendant named herein is amenable to suit in the State of South Dakota by reason of having sold, distributed, and/or installed their asbestos-containing products in South Dakota or by reason of having placed the same into the stream of commerce for use in South Dakota, and by reason of having committed tortious acts against the Plaintiffs in this state in addition to Defendants' other general product sales.

28.     Each Defendant named herein is amenable to jurisdiction in the courts of South Dakota by virtue of their respective conduct of substantial and/or systematic business

in South Dakota which subjects them to the jurisdiction of the South Dakota courts pursuant to the South Dakota Long-Arm Statute, S.D.C.L. § 15-7-2. Each Defendant corporation does or in the past mined, manufactured, processed, imported, converted, compounded, supplied, installed, replaced, repaired, used, and/or retailed substantial amounts of asbestos and/or asbestos-containing products, materials, or equipment, which are or in the past were sold, distributed, and used in South Dakota.

29.     Defendants are corporations who are subject to jurisdiction in the Courts of South Dakota for numerous reasons, including, but not limited to:

(a)     Defendants are foreign corporations that now conduct or have conducted business or business ventures, or have had offices or agencies within South Dakota, which subjects them to jurisdiction within South Dakota;

(b)     Plaintiffs' causes of action arise out of, or relate to, the business or business ventures conducted within South Dakota by each of the Defendants or through which the Defendants purposefully availed themselves of South Dakota, invoked the benefits and protections of South Dakota law, or otherwise could reasonably have foreseen that their activities would subject them to jurisdiction of the South Dakota courts;

(c)     Defendants' Asbestos Products were sold in South Dakota and Defendants' were aware that their Asbestos Products would be sold in South Dakota and directly or indirectly availed themselves of the South Dakota market as a market for their Asbestos Products;

(d)     Defendants' Asbestos Products acted upon Mr. Rogers in South Dakota;

(e)     Each foreign corporation engaged in a course of conduct that was nationwide, including within South Dakota, in its distribution and sale of Asbestos Products, and in its failure to provide adequate warnings;

(f)     Each foreign corporation specifically targeted South Dakota, directly or indirectly, as a market for its Asbestos Products;

(g)     Each foreign corporation has through agents, employees, brokers, jobbers, wholesalers, or distributors sold, consigned, or leased tangible or intangible personal property to persons in South Dakota;

(h)    Each foreign corporation has committed wrongful acts either outside or inside South Dakota causing injury to Mr. Rogers, including breaching its continuing duty to warn Mr. Rogers to avoid further asbestos exposures;

(i)    Each foreign corporation derives substantial revenue from interstate or international commerce and should reasonably have expected its acts to have consequences in South Dakota or any other state that would subject it to liability in those states;

(j)    Each foreign corporation has conducted substantial and not isolated activity within South Dakota; and/or

(k)    Each foreign corporation registered for the right to conduct intrastate business in South Dakota, conducted intrastate business in South Dakota pursuant to such registration, maintained a registered agent for service of process in South Dakota, and/or was served with process in this case via its South Dakota registered agent.

30.    The state of South Dakota has an overwhelming interest in exercising jurisdiction over this case and the causes of action alleged in it for numerous reasons including but not limited to:

(a)    Plaintiffs are and were at all relevant times citizens of South Dakota;

(b)    Mr. Rogers was exposed to Defendants' Asbestos Products in South Dakota;

(c)    Mr. Rogers, and/or the others who purchased the Asbestos Products at issue in this case to which Mr. Rogers was exposed to purchased Defendants' toxic Asbestos Products in South Dakota;

(d)    Mr. Rogers has received medical care for his disease in the state of South Dakota, among other states;

(e)    Each Defendant targeted South Dakota as a market for its deadly products and the same products to which Mr. Rogers was exposed also exposed numerous citizens of South Dakota at the same time;

(f)    South Dakota has a strong interest in protecting its citizens and other persons within its borders from exposure to dangerous products, particularly those products that are manufactured or sold in South Dakota;

(g)    South Dakota has a strong interest in providing its citizens and other persons exposed to asbestos within its borders with an effective and efficient forum for resolution of disputes regarding injuries to them, particularly injuries

caused by actions in the state and/or that manifest themselves in the state; and

(h)   South Dakota has a strong interest in providing an effective and efficient forum for the resolution of claims regarding tortious conduct that occurred in South Dakota.

31.   This Court has diversity jurisdiction over the parties as provided by 28 U.S.C. § 1332 because as set forth above, the Plaintiffs are citizens of the State of South Dakota and none of the Defendants are citizens of the State of South Dakota. The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

32.   Pursuant to 28 U.S.C. §1391(b)(2) venue is proper in this judicial district because a substantial part of the events or omissions occurred in the State of South Dakota.

## GENERAL ALLEGATIONS

33.   Plaintiff Gerald J. Rogers was exposed to the Asbestos Products that were mined, manufactured, distributed, sold, processed, imported, converted, compounded, installed, removed, marketed and/or supplied by the Defendants, or their predecessors.

34.   Despite knowing of the dangers of asbestos to the health and well-being of humans prior to and during all times relevant to the matters set forth in this Complaint, asbestos-containing equipment manufacturers such as Defendants permitted and encouraged and promoted the use of their respective asbestos-containing equipment and parts.

35.   Defendants failed to warn such persons that the waste generated by use of their Asbestos Products was hazardous and Defendants knew or should have known that the use of the their Asbestos Products as designed necessarily created an especially deadly hazard because they not only contained asbestos, but the regular use and maintenance of

their Asbestos Products created asbestos-containing waste that was readily and inevitably aerosolized when persons such as Mr. Rogers came into contact with it.

36.     The work Mr. Rogers and others to whom he was in close proximity performed with and on these Asbestos Products regularly and frequently exposed him to asbestos.

37.     Additionally, Mr. Rogers wore the same clothes to work that he wore home after work during the period of time he worked at Black Hills Power & Light.  The deadly asbestos dust that deposited on his person and clothing from Defendants' Asbestos Products was transported home and re-entrained, further exposing Mr. Rogers and family members with whom he lived to dust from Defendants' Asbestos Products.

38.     Despite knowing of the dangers of asbestos to the health and well-being of humans prior to and during all times relevant to the matters set forth in this Complaint, the manufacturers, sellers, distributors, retailers and/or suppliers of asbestos-containing products permitted and encouraged and promoted the use of their products.

39.     Plaintiff Gerald J. Rogers was exposed to and did inhale and/or ingest asbestos dust, fibers, and particles, as a result of his work with and around Defendants' Asbestos Products.

40.     Plaintiff Gerald J. Rogers was exposed to asbestos from Defendants' Asbestos Products and used Defendants' Asbestos Products in their intended manner and without significant change in their condition from the time when they were sold.

41.     Plaintiff Gerald J. Rogers relied upon the Defendants to instruct him and those working with and around their Asbestos Products regarding the proper methods of handling the products, being unaware of the dangerous properties of asbestos.  Each of these Defendants failed to do so.

42.     Plaintiff Gerald J. Rogers further relied upon the Defendants to warn of the dangerous properties of asbestos and the potential dangers that may be encountered in the use, operation, maintenance and repair of their Asbestos Products. Each of these Defendants failed to do so.

43.     Plaintiff Gerald J. Rogers' exposure to and inhalation of asbestos from the Defendants' Asbestos Products caused him to contract an asbestos-related disease, specifically malignant mesothelioma.

## ALLEGATIONS REGARDING KNOWLEDGE OF THE DANGER OF ASBESTOS

44.     At all times relevant to this lawsuit, Defendants were or should have been aware of the deadly danger of asbestos dust to workers using asbestos containing products or working around others who were using asbestos containing products.

## ASBESTOSIS

45.     As early as 1918, Frederick Hoffman, an insurance company actuary in the United States, wrote a report called "Mortality from Respiratory Diseases in Dusty Trades."

46.     In his report, Hoffman referred to the annual reports of the Chief Inspector of Factories in England and the reports of asbestos disease in England. Hoffman's 1918 report noted that it was the practice of American and Canadian life insurance companies to not sell life insurance to asbestos workers on account of the danger of asbestos.

47.     In 1924, Cooke, a pathologist in Britain published "Fibrosis of the Lungs Due to the Inhalation of Asbestos Dust." There followed a number of other reports in British sources regarding fibrosis of the lungs caused by asbestos dust.  This recognition

of the danger of asbestos was contemporaneously reflected in the United States as well in editorials of the Journal of the American Medical Association ("JAMA").

48.     In 1928, the JAMA published an editorial called "Pulmonary Asbestosis," which referred to Cooke's case and other reports on asbestosis. The JAMA recommended that further attention be paid to this disease, as it may well be occurring in the United States. The JAMA issued another editorial in 1930 about asbestosis, this time noting the asbestosis had become a compensable occupational disease in Great Britain under the workers' compensation law.

49.     In 1932, the first case of asbestosis in an asbestos product end-user was reported at a conference held by the Industrial Commission of Wisconsin, proceedings of which were published. Additional cases of asbestosis were reported in the United States in 1933 by Philip Ellman and also again reported by Ellman in 1934 in The British Journal of Radiology.

50.     In 1934, Wood and Gloyne published "Pulmonary Asbestosis: A Review of 100 Cases," in The Lancet, the world's oldest medical journal. The Lancet, like the British Medical Journal, is and was widely available in medical libraries in the English-speaking world, including in the United States. This article was widely cited in subsequent scientific and medical literature. Of the hundred cases of asbestosis Wood and Gloyne reported on, the shortest duration of exposure in any case was six months.

51.     By 1935, the risk of the disease involved was extended beyond mining and manufacturing plant workers and product users to include bystanders to such work – specifically clerical workers in asbestos manufacturing plants.

## ASBESTOS AS A CARCINOGEN

52.     The first reports regarding asbestos and cancer were published by Lynch and Smith in the United States in 1935 in the American Journal of Cancer and by Dr. Gloyne in Great Britain in Tubercle in two separate reports in 1935 and 1936. There were additional publications of cases of lung cancer and asbestosis in 1939 in the United States, and in 1941 and 1942 in Germany. Holleb and Angrist reported in the American Journal of Pathology on two individuals who had been users of asbestos products and who contracted both asbestosis and lung cancer.

53.     In 1942, Dr. Wilhelm Hueper published a book on occupational cancer called Occupational Tumors and Allied Diseases. Hueper's text included a lengthy section on asbestosis and cancer from asbestos.  This section contained large number of references from the United States, Great Britain and Germany in support of the view that asbestos was a carcinogen. Dr. Hueper made unequivocal statements that asbestos was a proven occupational cause of lung cancer in 1943 in the article called: "Cancer in its Relation to Occupational and Environment" published in the Bulletin of the American Society for the Control of Cancer.

54.     In 1944, the JAMA published an editorial called "Environmental Cancer" in 1944, in which asbestos was listed among agents known and suspected of causing cancer.

55.     Mesothelioma of the pleura was attributed to exposure to asbestos or asbestosis starting in 1943 with the report of Dr. H.W. Wedler. There were additional reports in the German literature as well as British literature. Numerous case reports in this regard were published prior to Wagner's landmark article in 1960.

56.     In the 1940s, the medical directors of various members of the American Petroleum Institute ("API") met and concluded that asbestos was a carcinogen.   This determination later informs the API's recognition by no later than 1948 of the danger of take-home exposure to carcinogens, which would include asbestos based upon the API medical directors' earlier recognition of asbestos as a carcinogen.

57.     The JAMA carried an editorial called "Asbestosis and Cancer of the Lung" in August of 1949. This reported British statistics on 235 deaths in which asbestosis had played a part. Of these 235, 31 (13%) of the individuals were also found to have cancers of the lung or pleura. The normal rate of lung cancer in the general population (including asbestos exposed persons) was 1% of all autopsies. This editorial in the JAMA was summarized in the Industrial Hygiene Digest in 1949 where it received even wider dissemination.

58.     In 1955, Doll published a statistical epidemiological evaluation of lung cancer and asbestos in the United Kingdom demonstrating significant excess mortality from lung cancer for those exposed to asbestos. Numerous additional publications appeared throughout the 1950s and early 1960s regarding asbestos and cancer.

59.     By the mid-1960s the grave danger to bystanders of those working with asbestos-containing products was firmly established in the scientific community.  In 1964, Dr. Irving Selikoff published a study in JAMA showing a substantial excess of cancer and asbestosis deaths among people involved in the insulating trades.  Selikoff noted that the danger of invisible airborne asbestos fibers was in not confined to the worker directly handling the asbestos: "A particular variety of environmental exposure may be of even greater concern. Asbestos exposure in industry will not be limited to the particular craft that utilizes the material. The floating fibers do not respect job classifications. Thus, for

example, insulation workers undoubtedly share their exposure with their workmates in other trades; intimate contact with asbestos is possible for electricians, plumbers, sheet-metal workers, steamfitters, laborers, carpenters, boiler makers and foremen; perhaps even the supervising architect should be included."

60.     Later in 1964, at an international conference held in New York the proceedings of which were published in 1965, numerous researchers from around the world discussed the extensive deadly danger of asbestos.

61.     At the conference in New York, British researchers Newhouse and Thompson presented a report on 76 deceased mesothelioma patients and an equal number of "controls," based on interviews with relatives. Their report showed strong evidence that mesothelioma patients were far more likely to have had occupational, household, or neighborhood exposure to asbestos than the comparison patients who died from other causes at the same hospital.

62.     By 1964, there was no reasonable question in the scientific, industrial and medical communities that asbestos was a carcinogen that endangered the lives of workers who used asbestos and asbestos containing products, bystanders to those workers, family members of workers who were exposed to asbestos and individuals who lived in the vicinity of facilities that manufactured and/or used asbestos products.

### NO SAFE LEVEL FOR CANCER

63.     At all times relevant to this case, there was never any accepted "safe" level of exposure to asbestos when considering the causation of cancer.

64.     While there have been, at various times in history, Threshold Limit Values ("TLV") or Maximum Allowable Concentrations ("MAC") set for exposure to asbestos dust, these levels were proposed in the context of limiting the risk of asbestosis, not cancer.

65.     Indeed, in 1948, the American Conference of Governmental Industrial Hygienists ("ACGIH") noted that any claim that the TLV/MACs constituted a "safe" level of exposure was a "figment of the imagination."

66.     In 1952, Dr. Mayers of New York, and in 1956, Warren Cook, observed that MACs that were recommended to prevent effects other than cancer could not be considered to be safe if the substances also caused cancer.

67.     Contemporaneously, Herbert Stokinger, a well-known figure in occupational health, recommended reducing the TLV by a factor of 100-500 times for a carcinogen, such as asbestos, when the TLV was created to protect against a chronic disease like asbestosis.

68.     In 1956, when the industrial hygiene and public health community first began to critically evaluate the TLV with regard to carcinogens, Union Carbide's Henry Field Smyth proclaimed that when it came to carcinogens, "it is prudent to set the standard . . . at zero . . . and no consideration can justify allowing the inhalation of any concentration which is avoidable."

69.     Many corporations recognized that the asbestos TLV was not protective for cancer.  Indeed, many corporations recognized the meaningless nature of the asbestos TLV because, as formulated, it measured the amount of total dust in the air, rather than the actual dose of the harmful asbestos.

70.     For example, in 1955, the major asbestos company Turner Brothers recognized the ACGIH TLV as "meaningless."   In 1967 and 1968, DuPont recognized the TLV was not protective of disease and enacted its own TLV for asbestos, setting the limit its workers could be exposed to at 500,000 particles per cubic foot – one tenth (1/10[th]) of the then existing TLV for asbestos.

71.     The lack of any safe level of exposure to carcinogens was widely and generally accepted in the late 1950s and 1960s. For example, at the 1964 Conference on the Biological Effects of Asbestos, one corporate safety man stated: "We do not believe there is any safe limit. We have our ideas as to how low we can get and are always striving to get right down to zero." That same commentator made clear the American total dust TLV had "no scientific basis." An American observer commented that "as far as a safe level of asbestos is concerned, our own conclusion . . . is that there is no safe level. The safe level is nil and anything above the safe level represents certain risk."

## ASBESTOS IS A DEADLY DANGER AND MUST BE CONTAINED WHEN RELEASED

72.     Since no later than the seminal report of Merewether & Price in 1930, the need to prevent the creation of asbestos dust and, if dust was created, to control the dispersion of the dust has been well established.  The general principles of how to prevent and control the dispersion of asbestos dust have been recognized and generally accepted since no later than 1930.

73.     The first step is always to educate the worker of the nature and extent of the danger so that the worker has a "sane appreciation of the risk."

74.     The second step, if possible, is to substitute a non-dangerous material for the potentially dangerous material.  In the case of asbestos, there have been non-asbestos substitutes available for most, if not all, applications since the 1950s at the latest.  While these non-asbestos alternatives often would require an additional cost, whether in terms of material costs, application or design costs, or a combination of both, alternatives were reasonably available.

75.     The third step is to institute work practices that will eliminate or reduce the creation of dust.  Asbestos is generally only hazardous if it is inhaled or otherwise ingested.  By instituting work practices that prevent the creation of dust, such as wet handling methods, the hazard can be greatly reduced.

76.     The fourth step, if the creation of dust cannot be prevented, is to contain the dust at the point of creation through isolation of the work space, local exhaust ventilation and proper collection and disposal of the dust so collected.

77.     The fifth step, if local ventilation is not possible or not completely effective is to have general ventilation and collection of dust so that excessive concentrations of dust that escape local collection are prevented.  Like local ventilation, general ventilation must have proper collection and dust disposal to prevent unnecessary exposures.

78.     In the event none of these steps controls the danger, and only as a stop-gap measure, personal respiratory protection can provide temporary additional protection to workers in an asbestos-contaminated environment.

79.     Since the 1930s, it has been recognized that the employee and/or his or her clothing can act as a vector for asbestos and other toxic materials leaving the workplace and exposing the worker and others to the toxin after they leave the workplace.

80.     It has similarly been recognized since no later than 1960 that persons simply in the vicinity of activities that create airborne asbestos dust are in danger of asbestos disease generally and mesothelioma specifically.

81.     At all times relevant to this case, the containment of asbestos dust created from work with asbestos and asbestos-containing products was known to be necessary to prevent exposure and disease amongst persons exposed to dust that escaped the work area

– whether through airborne dispersion of the dust or on the bodies and clothing of the worker.

## ALLEGATIONS REGARDING DEFENDANTS' DUTY OF CARE

82.     At all relevant times, each of the Defendants had a duty to exercise reasonable care and caution for the safety of individuals who were foreseeably endangered by the use of their Asbestos Products to protect them from an unreasonable risk of harm.

83.     At all relevant times, each of the Defendants owed individuals who were foreseeably endangered by the use of their Asbestos Products a duty to warn and to take precautionary measures to protect them from an unreasonable risk of bodily harm.

84.     Each of the Defendants' duty of care extended to Plaintiff Gerald J. Rogers, who is a definite class – users, supervisors, bystanders, and members of the households of users and bystanders.

## FIRST CAUSE OF ACTION
## NEGLIGENCE

85.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein at length.

86.     At all material times, Defendants are or were miners, manufacturers, distributors, processors, importers, converters, compounders, users, suppliers, and/or retailers of asbestos and/or asbestos-containing products, materials or equipment.

87.     The Defendants, acting through their agents, servants, and/or employees caused, and have caused in the past, certain asbestos and asbestos-containing materials, products or equipment to be placed in the stream of interstate commerce with the result of that said asbestos and asbestos-containing materials, products, or equipment came into use by Mr. Rogers.

88.     Confidential corporate documents from many of the named Defendant companies reveal that (a) the dangers of asbestos were well understood; (b) asbestos was cheaper to use in the products than replacement substances such as clay; (c) the product manufacturing industry actively fought governmental regulation and the banning of asbestos.  To this day industry has been successful in their lobbying efforts to keep asbestos legal in the United States.

89.     Throughout the course of his employment, Mr. Rogers worked with and was exposed to the asbestos and asbestos-containing materials, products, or equipment mined, manufactured, processed, imported, converted, compounded, used, supplied, and/or sold by the Defendants.

90.     During the course and scope of his employment, Mr. Rogers was exposed to Defendants' asbestos and asbestos-containing materials, products, or equipment, which exposure directly and proximately caused him to develop an illness known and designated as Mesothelioma.

91.     Defendants, acting by and through their servants, agents, and employees, duly authorized and acting within the scope and authority of their employment, had a duty to design, manufacture and sell products that were not unreasonably dangerous or defective and/or a duty to warn Mr. Rogers and foreseeable users of said products of the dangers and defects which the Defendants created, knew, or, within the exercise of reasonable care, should have known.

92.     Mr. Rogers, whose livelihood was dependent upon the work that he did for the employer listed above, was required to work with and around asbestos and/or asbestos-containing products, materials or equipment that manufactured, processed, distributed, supplied and/or sold by Defendants. Defendants knew or should have known that persons

employed such as Mr. Rogers would be required to and would come into contact with and would work in close proximity to said products.

93.     Mr. Rogers sustained injuries caused by no fault of his own and which could not be avoided through the use of his reasonable care. Mr. Rogers' development of an asbestos-related disease was directly and proximately caused by the negligence and carelessness of Defendants in that they manufactured, processed, sold, supplied or otherwise put said asbestos or asbestos-containing products, materials or equipment, into the market and into the stream of interstate commerce, while they knew, or in the exercise of ordinary care should have known, that said products were deleterious, poisonous, cancer-causing and/or inherently dangerous and harmful to Mr. Rogers' body, lungs, respiratory system, skin, health, and general well-being. Further, Defendants knew or in the exercise of reasonable care should have known that Mr. Rogers would not know of such danger to his health.

94.     Mr. Rogers' illness and disability are the direct and proximate result of the negligence and carelessness of Defendants, jointly and severally, in that, even though the Defendants knew, or in the exercise of ordinary care should have known, that the asbestos and asbestos-containing materials, products or equipment were deleterious, poisonous, and highly harmful to Mr. Rogers' body, lungs, respiratory system, skin, and health.

95.     Defendants breached their duties and were negligent in the following acts and/or omissions:

(a)     Affirmatively chose not to advise Mr. Rogers of the dangerous characteristics of their asbestos and/or asbestos-containing materials, products or equipment;

(b)     Affirmatively chose not to provide Mr. Rogers with the knowledge as to what would be reasonably safe and sufficient apparel and protective equipment and appliances to reduce exposure to inhalable asbestos fibers,

if in truth they were in any way able to protect him from being poisoned and disabled as he was by exposure to such deleterious and harmful asbestos-containing materials, products or equipment;

(c) Affirmatively chose not to place any warnings or sufficient warnings on their containers of said asbestos and asbestos-containing materials, products or equipment to warn the handlers of the dangers to health in coming in contact with said asbestos and asbestos-containing materials, products or equipment;

(d) Affirmatively chose not to take reasonable precautions or to exercise reasonable care to publish, adopt, and enforce a safety plan and a safe method of handling and installing said asbestos-containing materials, products or equipment;

(e) Inadequately warned, if, in fact, they warned at all, persons such as Plaintiff of the dangers to their health in coming in contact with and breathing said asbestos fibers from asbestos and/or asbestos-containing materials, products or equipment;

(f) Chose not to recommend methods to improve the work environment;

(g) Affirmatively chose not to develop alternative products;

(h) Continued to use a known cancer-causing product, to-wit: asbestos; and

(i) After discovering that the asbestos exposure caused a progressive lung disease, the defendants affirmatively chose not to inform the Plaintiff of the need for monitoring and periodic evaluations up to and including the filing of this Complaint.

96. Defendants, at the time of designing, manufacturing, distributing, selling, or otherwise placing asbestos and/or asbestos-containing products, materials or equipment into the stream of commerce, knew, or in the exercise of reasonable care, should have known about the risks associated with their products. The products in question were defective at the time they left the control of the Defendants.

97. Defendants were negligent and breached their duty of due care to Mr. Rogers by taking or choosing not to take the actions as previously alleged to avoid harm to Mr. Rogers and other foreseeable users, in light of the reasonably foreseeable dangers caused by the design, manufacture, sale, distribution of the asbestos and/or asbestos-containing products, materials, or equipment at issue in the stream of commerce.

98.     The hazards posed by exposure to asbestos and/or asbestos-containing products, materials, or equipment and the resulting injuries and damages to Plaintiffs were reasonably foreseeable or should have been reasonably foreseen by Defendants.

99.     As a direct and proximate result of the aforesaid negligent acts and/or omissions by the Defendants, Mr. Rogers developed Malignant Mesothelioma, as a consequence of which, through no fault of his own, he was severely injured, disabled and damaged.

100.    As a result of the above, Plaintiffs seek damages as hereinafter demanded.

## SECOND CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY

101.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein at length.

102.    The Defendants impliedly warranted that said asbestos materials were of good and merchantable quality and fit for their intended use.

103.    The implied warranty made by the Defendants that the asbestos and asbestos-containing materials, products, or equipment were of good and merchantable quality and for the particular intended use was breached and that certain harmful, poisonous, and deleterious matter was given off into the atmosphere wherein Mr. Rogers carried out his duties while working with or in the vicinity of asbestos and asbestos-containing materials, products, or equipment.

104.    As a direct and proximate result of the implied warranty of good and merchantable quality and fitness for the particular intended use, Mr. Rogers developed an illness, to-wit: Mesothelioma.

105.    As a result of the above, Plaintiffs seek damages as hereinafter demanded.

## THIRD CAUSE OF ACTION
## GROSS NEGLIGENCE-WILLFUL, WANTON, AND RECKLESS CONDUCT

106.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein at length.

107.    Mr. Rogers and others in his position worked in close proximity to the asbestos and asbestos-related materials used or manufactured by the Defendants, and the exposure and hazard to each of them, in Mr. Rogers' presence, as well as others in his position, was known, or in the exercise of reasonable care should have been anticipated, by the Defendants.

108.    The Defendants have known or should have known since at least 1928, and possibly as early as 1890, of medical and scientific data which clearly indicates that the products, asbestos, and asbestos-containing products, were hazardous to the health and safety of the Plaintiff and others in the Plaintiff's position, and prompted by pecuniary motives, the Defendants, individually and collectively, ignored and chose not to act upon said medical and scientific data and conspired to deprive the public, and particularly the users, of said medical and scientific data, depriving them, therefore, of the opportunity of free choice as to whether or not to expose themselves to the asbestos products of said Defendants. As a result, Plaintiffs have been severely damaged as set forth below.

109.    The Defendants intentionally and fraudulently continued to conceal the dangers of asbestos exposure from 1928 through the 1970s, thus denying Mr. Rogers the knowledge with which to take necessary safety precautions such as periodic x-rays and medical examinations, quitting smoking, and avoiding further dust exposure. Specifically, Defendants' intentional and fraudulent conduct included the following acts and omissions:

(a)    affirmatively choosing not to warn prior users when the Defendants had knowledge of the need for monitoring due to prior exposure;

(b)     affirmatively choosing not to issue recall type letters to prior users;

(c)     frustrating the publication of articles and literature from the 1930's through at least 1976;

(d)     rejection by top management of advice of corporate officials to warn of the hazards of their asbestos products; such rejection being motivated by the possibility of adverse effects on profits; and

(e)     the intentional inadequacy of (and delay in the use of) the warnings on asbestos products.

110.     The acts of the Defendants, as hereinabove set forth were intentional and willful and done with willful disregard of the safety of Mr. Rogers and others similarly situated at a time when Defendants, had knowledge, or should have had knowledge of the dangerous effect of asbestos and asbestos-containing materials, products, or equipment upon the body of human beings, including Mr. Rogers and others similarly situated, and even though forewarned by tests, standards, promulgations of rules and regulations, statutes, and ordinances recognized by the Defendants and subscribed to by them, nevertheless placed into the stream of commerce, for their own profit, this dangerous asbestos material with full knowledge that it was being used and would be used in the future to the detriment of the health of Mr. Rogers and others similarly situated, and Plaintiffs are thereby entitled to punitive damages.

111.     Accordingly, as a result of the Defendants' conduct in which they acted in willful, wanton, gross negligence and in total disregard for the health and safety of the user or consumer, such as Mr. Rogers, Plaintiffs therefore seek exemplary and punitive damages against Defendants to punish the Defendants for their actions, which were willful, wanton, gross, and in total disregard of the health and safety of the users and consumers of their products.

## FOURTH CAUSE OF ACTION
## <u>NEGLIGENT MISREPRESENTATION</u>

112.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein at length.

113.    During, before, and after Mr. Rogers' exposure to asbestos products manufactured, installed or otherwise used by Defendants, the Defendants falsely represented facts, including the dangers of asbestos exposure, to Mr. Rogers in the particulars alleged in the paragraphs above, while Defendants each had actual knowledge of said dangers of asbestos exposure to persons such as Mr. Rogers, and while Defendants each knew of the falsity of their representations and/or made the representations in reckless disregard of their truth or falsity.

114.    The foregoing representations were material conditions precedent to Plaintiff's continued exposure to asbestos containing products, and Defendants each intended that Plaintiff act upon the representations by continuing his exposure to the asbestos products. Mr. Rogers was ignorant of the falsity of Defendants' representations and rightfully relied upon the representations.

115.    As a direct and proximate result of Mr. Rogers' reliance upon Defendants' false representations, Plaintiffs have suffered injury and damages hereinafter described.

## FIFTH CAUSE OF ACTION
## <u>FAILURE TO WARN</u>

116.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein at length.

117.    At all times material hereto, the Defendants knew or should have known of the harmful effects and/or harmful dangers of working with asbestos and/or asbestos-containing products, materials, or equipment and exposures to inhalable asbestos.

118.    Defendants had a duty to warn individuals working at Mr. Rogers' worksite, including but not limited to Mr. Rogers, of the dangers associated with the use and/or inhalation of asbestos dust and fibers.

119.    Despite Defendants' knowledge of the harm and/or potential harm associated with the use and/or inhalation of dust and fibers from asbestos and/or asbestos-containing products, materials, or equipment, Defendants chose not to warn and/or inadequately warned Mr. Rogers of the dangers, including but not limited to:

    (a)    choosing not to provide adequate cautions, warnings, and/or hazard statements and/or explanations with its products which should have been designed to provide Mr. Rogers knowledge about the hazards caused by exposure to their products and how to eliminate such hazards;

    (b)    choosing not to provide adequate product inserts, informative brochures, employee training literature, posters, and/or other written materials with their products which should have been designed to provide Mr. Rogers knowledge about the hazards caused by exposure to its products and how to eliminate such hazards;

    (c)    choosing not to conduct on-site personnel training sessions with exposed workers which should have been designed to provide to the workers knowledge about the hazards caused by exposure to the products, and how to eliminate the hazards;

    (d)    choosing not to adequately test and research their products as to the hazards created during their use and failed thereafter to provide the results of such tests and research to exposed workers such as Mr. Rogers;

    (e)    choosing not to inspect the workplace in which their products were being used to determine whether the products being used were deleterious to the health of exposed workers;

    (f)    choosing not to design, process and transport their products in a manner intended to minimize exposure during normal working conditions;

    (g)    choosing not to specify and market their products on the express agreement that necessary engineering controls, work practices, and other industrial hygiene controls would be implemented in conjunction with use of the products after it was known or should have been known that adequate protective measures were not being implemented;

(h)     choosing not to recall their defective product or manufacture a reasonably safer alternative;

(i)     choosing not to take adequate precautions and industrial hygiene measures to protect Mr. Rogers and exposing workers when installing, repairing, or tearing out asbestos and/or asbestos-containing products, materials, or equipment including, but not limited to, providing protection from dust and fibers emanating from the installation, repair, and/or removal process; choosing not to use local ventilation; choosing not to provide warnings to Mr. Rogers and workers in the facilities at issue that exposure to dust and fibers from asbestos and/or asbestos-containing products, materials, or equipment was hazardous and carcinogenic; choosing not to adequately clean up debris from the installation, repair and/or removal process; failing to use wet down procedures; and/or failing to take other appropriate safety and industrial hygiene measures;

(j)     otherwise choosing not to act reasonably under the totality of the circumstances.

120.    Defendants manufactured, processed and/or sold asbestos and/or asbestos-containing products, materials, or equipment, for Mr. Rogers' employer, and these products were used by Mr. Rogers' employer. Thus, Defendants had a duty to warn individuals working at Mr. Rogers' jobsite, including but not limited to Mr. Rogers, of the dangers associated with the use and/or inhalation of dust and fibers from asbestos and/or asbestos-containing products, materials, or equipment.

121.    Despite Defendants' knowledge of the harm and/or potential harm associated with the use and/or inhalation of dust and fibers from asbestos and/or asbestos-containing products, materials, or equipment, the Defendants acted unreasonably in choosing not to provide adequate warnings and/or instructions as to the hazards associated with exposure to asbestos and/or asbestos-containing products, materials, or equipment.

122.    At the time the asbestos and/or asbestos-containing products, materials, or equipment left Defendants' control without adequate warning or instruction, Defendants created an unreasonably dangerous condition that they knew or should have known would pose a substantial risk of harm to a reasonably foreseeable claimant, such as Mr. Rogers.

In the alternative, after the asbestos-containing products left Defendants' control, Defendants became aware of or in the exercise of ordinary care should have known that their product posed a substantial risk of harm to a reasonably foreseeable user, such as Mr. Rogers, and refused to take reasonable steps to give adequate warning or instruction or to take any other reasonable action under the circumstances.

123.    Defendants' conscious decision not to provide adequate warnings as to the hazards associated with exposure to asbestos and/or asbestos-containing products, materials, or equipment or to provide proper instructions on the use, handling, and storage of asbestos and/or asbestos-containing products, materials, or equipment caused Mr. Rogers to develop Mesothelioma as a consequence of which he has been injured and damaged and claims damages of the Defendant jointly and severally.

124.    As a result of the Defendants affirmatively choosing not to warn, Plaintiffs suffered and will continue to suffer the following injuries and damages hereinafter alleged.

**SIXTH CAUSE OF ACTION**
**STRICT LIABILITY**

125.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein at length.

126.    At all material times, Defendants are or were miners, manufacturers, distributors, processors, importers, converters, compounders, users, suppliers, and/or retailers of asbestos and/or asbestos-containing products, materials or equipment.

127.    At all times material hereto, the Defendants knew or should have known of the harmful effects and/or harmful dangers of working with asbestos and/or asbestos-containing products, materials, or equipment and exposures to inhalable asbestos.

128.    Defendants had a duty to warn individuals working at Mr. Rogers' jobsite, including but not limited to Mr. Rogers, of the dangers associated with the use and/or inhalation of asbestos dust and fibers.

129.    Despite Defendants' knowledge of the insurable harm and/or potential harm associated with the use and/or inhalation of dust and fibers from asbestos and/or asbestos-containing products, materials, or equipment, the Defendants affirmatively chose the level of warning by either not warning and/or inadequately warning Mr. Rogers of the dangers of asbestos and asbestos dust.

130.    The products mined, manufactured, sold, distributed, supplied and/or used by these defendants were defective, unreasonably dangerous, inherently dangerous, insurable and unreasonably dangerous per se to Mr. Rogers, who was an intended and foreseeable user and/or bystander exposed to these products. These defects include, without limitation, the following:

(a)    The mining, manufacture, sale, supply, distribution and use of products that are unreasonably dangerous, or unreasonably dangerous per se;

(b)    The mining, manufacture, sale, supply, distribution and use of products that possess inherent and known properties that make them unreasonably dangerous by presenting high potential for causing serious injury, such as respiratory disease, cancer, and other health problems to Mr. Rogers who would be foreseeably exposed to them as a result of their intended use;

(c)    The act of not warning or insufficiently warning of the hazards these products would present in the course of their normal foreseeable use or intended use;

(d)    Providing inadequate cautions, warnings, and/or hazard statements and/or explanations with its products which should have been designed to provide to the Plaintiff knowledge about the hazards caused by exposure to their products and how to eliminate such hazards;

(e)    Providing inadequate product inserts, informative brochures, employee training literature, posters, safety instructions and/or other written materials with their products which should have been designed to provide to the

Plaintiff knowledge about the hazards caused by exposure to its products and how to eliminate such hazards;

(f)     Conducting inadequate on-site personnel training sessions with exposed workers which should have been designed to provide to the workers' knowledge about the hazards caused by exposure to the products, and how to eliminate the hazards;

(g)     Inadequately testing and researching their products as to the hazards created during their use and providing incomplete results of such tests and research to the intended or foreseeable users of exposed individuals such as Mr. Rogers;

(h)     Inadequately inspecting workplaces in which their products were being used to determine whether the products being used were deleterious to the health of exposed workers or individuals;

(i)     Inadequately inspecting their products to assure sufficiency and adequacy of warnings and safety cautions;

(j)     Inadequately designing, processing and transporting their products in a manner intended to minimize exposure during normal working conditions;

(k)     Inadequately designing their products when the nature of the product did not require use of asbestos mineral or where alternate, equally suitable substances were readily available;

(l)     Defects in the composition and construction of these products;

(m)    Affirmatively specifying and marketing their products without the express agreement that necessary engineering controls, work practices, and other industrial hygiene controls would be implemented in conjunction with use of the products after it was known or should have been known that adequate protective measures were not being implemented;

(n)     Issuing inadequate recalls of their defective product or manufacturing a reasonably safer alternative;

(o)     Inadequately packaging their products so that they could be safely transported, handled, stored or disposed of;

(p)     Implementing inadequate precautions and industrial hygiene measures to protect Mr. Rogers and exposed workers when installing, repairing, or tearing out asbestos and/or asbestos-containing products, materials, or equipment including, but not limited to, providing protection from dust and fibers emanating from the installation, repair, and/or removal process; using or implementing inadequate local ventilation, warnings, cleaning procedures and other appropriate safety and industrial hygiene measures;

(q)     Acting unreasonably under the totality of the circumstances.

131.     It was the continuing duty of the defendants to advise and warn purchasers, consumers, and users, and all prior purchasers, consumers, and users, of all dangers, characteristics, potentialities and/or defects discovered subsequent to their initial marketing or sale of said asbestos and asbestos products.

132.     The actions of the Defendants described and alleged above were wrongful under South Dakota law governing strict liability claims in one or more of the following ways:

(a)     Said asbestos-containing products were unreasonably defective in one or more of the following ways:

i.     in that said products were and are unavoidably unsafe, and defendants affirmatively chose how to warn, selecting to carry improper, inadequate and incorrect warnings about their asbestos dust hazards about which the defendants knew or should have known;

ii.     in that said products were and are unreasonably dangerous, in that they were and are dangerous to an extent beyond that which the ordinary worker or bystander in the position of the Plaintiff would contemplate;

iii.     in that any warnings, information and/or safety instruction said products may have carried, were improper and inadequate in that they affirmatively determined the information told users and/or others, including the plaintiff, leading to inadequate and unreasonable communication of the hazards and dangers of coming in contact with said products, including the risk of cancer and death.

(b)     The defendants knew or should have known that said asbestos-containing products were inherently dangerous to those who used them, yet the defendants affirmatively chose not to use reasonable and/or ordinary care in seeing to it that said products carried proper, adequate and correct warnings of the dangers of said products, and the exposure of the plaintiff and others like the plaintiff to these products was reasonably foreseeable to the defendants.

(c)     The defendants breached warranties, either implied or expressed, in that these products were not fit and/or safe for their known and intended purposes and uses.

(d)     The Defendants impliedly warranted that said asbestos materials were of good and merchantable quality, safe, and fit for their intended use.

(e)     The implied warranty made by the Defendants that the asbestos and asbestos-containing materials, products, or equipment were of good and merchantable quality and for the particular intended use was breached and that certain harmful, poisonous, and deleterious matter was given off into the atmosphere wherein Plaintiff carried out his duties while working with or in the vicinity of asbestos and asbestos-containing materials, products, or equipment.

(f)     As a direct and proximate result of the implied warranty of good and merchantable quality and fitness for the particular intended use, Plaintiff developed an illness, to-wit: Malignant Mesothelioma.

133.     Defendants chose not provide adequate warnings as to the hazards associated with exposure to asbestos and/or asbestos-containing products, materials, or equipment or to provide proper instructions on the use, handling, and storage of asbestos and/or asbestos-containing products, materials, or equipment. Defendants' affirmative acts caused Mr. Rogers to develop malignant mesothelioma, which injured and damaged Plaintiffs and for which they claim damages of the Defendants in strict liability.

134.     The defective conditions of Defendants' products and fault, and affirmative acts as noted above, are a proximate cause of Plaintiffs' injuries complained of herein.

135.     As a result of the Defendants' actions, the Plaintiffs suffered and will continue to suffer the following injuries and damages hereinafter alleged.

## PUNITIVE DAMAGES

136.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein at length.

137.     As a result of the willful, wanton and gross misconduct and gross negligence of the Defendants as alleged herein, Plaintiffs seek and request punitive or exemplary damages. Defendants malicious and outrageous disregard for the safety of users

of asbestos products, including Mr. Rogers, including but not limited to their intentional concealment of the dangers of asbestos that they knew of yet consciously refused to warn users of those dangers evidences a conscious indifference to the safety and health of users and bystanders of the products they profited from selling. Plaintiffs, therefore, seek punitive damages or exemplary damages, according to proof.

## LOSS OF CONSORTIUM

138.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein at length.

139.   As a direct and proximate result of the injuries and damages complained of herein with respect to Mr. Rogers, and as a direct and proximate result of the acts and omissions of the Defendants, Mrs. Rogers, his spouse, has also suffered and will continue to suffer loss of the consortium, society, companionship, fellowship and other valuable services of her husband; and therefore Mrs. Rogers is entitled to damages for her loss of consortium, both past and future. Mr. Rogers has been unable to perform the necessary duties of a spouse and the work and service usually performed in the care, maintenance, and management of the family home, and Mr. Rogers will be unable to perform such work, services, and duties in the future. As a proximate result thereof, Mrs. Rogers has been permanently deprived and will be deprived of the consortium of her spouse, including the performance of duties, all to her damages, in an amount presently unknown to Plaintiffs but which will be proved at the time of trial.

## DAMAGES

140.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

141.    As a result of Mr. Rogers' development of asbestos related malignant mesothelioma, a terminal asbestos cancer, Plaintiffs have suffered and sustained very serious injuries.

142.    Mr. Rogers has suffered great pain, disfigurement, physical impairment, extreme nervousness, and mental anguish as a direct result of the aforesaid injuries.

143.    Mr. Rogers' enjoyment of life was greatly impaired, he will suffer loss of earning capacity, and further, his expected life span was greatly shortened.

144.    Plaintiffs allege that as a result of the aforesaid illnesses, they have been forced to incur large amounts of medical expenses by way of drug, doctor, and other medical bills.

145.    Prior to the onset of his symptoms, Mr. Rogers was extremely active and participated in numerous hobbies and activities, and as a result of his illness, Mr. Rogers was prevented from engaging in some of said activities that were normal to him prior to developing his asbestos-related lung disease. Mr. Rogers was otherwise prevented from participating in and enjoying the benefits of a full and complete life.

146.    Plaintiffs have suffered and lost love, affection, society, support, services, future earnings, medical expenses, and experienced mental pain, suffering and distress as a result of Mr. Rogers' mesothelioma.

**WHEREFORE**, Plaintiffs verily believe they are entitled to damages against the Defendants by reason of said negligence, strict liability, gross negligence, breach of warranty, false representation, failure to warn, fraudulent misrepresentations, and other breaches of duty as alleged herein proximately caused by the fault of the Defendants, and claim actual damages, lost wages, special damages, and punitive and exemplary damages including attorneys' fees.

**WHEREFORE**, Plaintiffs pray for judgment against all Defendants for actual damages, lost wages, special damages, and punitive and exemplary damages including attorneys' fees, in amounts to be determined by statute or by the trier of fact, plus the costs of this action.

<u>**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**</u>

Dated the _6th_ day of August, 2021.

Respectfully submitted,

**BEARDSLEY JENSEN & LEE,
Prof. L.L.C.**

By: /s/ *Brad J. Lee*
Brad J. Lee
4200 Beach Drive, Suite #3
P.O. Box 9579
Rapid City, SD 57709
Tel: 605-721-2800
Fax: 605-721-2801
E-mail: *blee@blackhillslaw.com*

**and**

**THE NEMEROFF LAW FIRM, P.C.**

Richard I. Nemeroff, UT Bar No. 13966
(*pro hac vice pending*)
Ryan P. Phillips, PA Bar No. 320504
(*pro hac vice pending*)
12720 Hillcrest Road
Suite 700
Dallas, TX 75230
Tel: 214-774-2258
Fax: 214-393-7897
E-mail: *ricknemeroff@nemerofflaw.com*
          *ryanphillips@nemerofflaw.com*

**COUNSEL FOR PLAINTIFFS**

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
GERALD J. ROGERS and CHERYL A. ROGERS

**(b)** County of Residence of First Listed Plaintiff   Meade
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Brad J. Lee, Beardsley, Jensen & Lee, P.O. Box 9579,
Rapid City, SD  57709; 605-721-2800

## DEFENDANTS
AURORA PUMP COMPANY, ET AL.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
  Plaintiff
- ☐ 3  Federal Question
  *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government
  Defendant
- ☒ 4  Diversity
  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☒ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Section 1332; 28 U.S.C. Section 1391(b)(2) - diversity and events occurred in South Dakota

Brief description of cause:
Exposure to asbestos; claims of failure to warn, duty of care, negligence, breach of implied warranty, etc.

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $  Over $75,000.00       CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*       JUDGE _____   DOCKET NUMBER _____

DATE
8-5-2021

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____